## THE MAYOR & CITY COUNCIL OF BALTIMORE, *vs.* NATHANIEL WILLIAMS & JOS. B. WILLIAMS.

Where a deed conveys land in trust for such uses and trusts as are contained in a will *already executed*, and contains no power of revocation, the property passes under the deed, and the uses and trusts take effect by virtue of the deed. (*Per Le Grand, J.*, and affirmed by the Court of Appeals.)

Where a deed conveys lands in trust for such uses as are *declared or set out* in a will *already made*, neither the deed nor the will is revocable if no power of revocation is reserved in the deed. (*Id.*)

Where the deed refers to the will and the will has limited the estate, it is as if all the limitations had been comprised in the deed.

But where a deed conveys lands in trust for such uses as the grantor may *afterwards* appoint by will or deed, and the appointment be made by will, it may be revoked and new uses declared, but if made by deed it cannot be revoked, if the deed executing the power reserves no authority to revoke.

A deed conveying lands in trust for such uses as are declared and set out in a will already made, and reserving to the grantor a life interest in the property, but containing no power of revocation, is not a testamentary paper.

The decisions in England upon the construction of the statute of 27*th Elizabeth*, *ch.* 4, made *subsequent* to our Revolution, are not to be received as *absolute authority* by our courts, except in so far as they show what the law was *prior* to that event. (*Per Le Grand, J.*, and affirmed by the Court of Appeals.)

At the period of our Revolution the construction of this statute was not *settled* by the English decisions, and it is the duty of our courts to give it such

·interpretation as its language justifies and as is approved by the American authorities. (*Id.*)

A *bona fide* voluntary conveyance is not, *per se*, void as against a subsequent purchaser for value, and the statute does not condemn such conveyances as *voluntary*, but only such of them as are *fraudulent* and *covinous*. (*Id.*)

If a subsequent purchaser *has notice* of the existence of a prior voluntary deed, his deed cannot take precedence over the voluntary one if the latter be *bona fide.* (*Id.*)

A subsequent sale *without notice* by a person who has made a prior voluntary settlement, is presumptive evidence of fraud, which casts upon those claiming under the settlement the *onus* of proving it to have been made *bona fide.*

Constructive notice furnished by the recording of the voluntary conveyance under our registry acts, is sufficient to bind the subsequent purchaser for value. (*Per Le Grand, J.*, and see note at the end of this case.)

Where an instruction asks a court of law to submit a question of fraud to the jury, if there is *any* evidence legally tending to prove the fraud the prayer should be granted.

Inadequacy of price, in connection with other sustaining *proof*, may be considered in a case where a deed is sought to be avoided for fraud.

Where a prayer is good, *exclusive* of a proviso by which a circumstance is added legitimate for the consideration of the jury in connection with matters previously submitted to them, such proviso cannot vitiate the prayer.

APPEAL from Baltimore county court.

*Assumpsit* by the appellees against the appellants, to recover the sum of $818.66, in the hands of the latter as stakeholders, it being the amount of damages assessed in favor of the owner of a lot of ground in the city of Baltimore through which a street had been opened. The count in the declaration relied upon was for *money had and received.* Plea, *non assumpsit.*

The plaintiffs claimed the money under a deed of trust to them of all the property of Hannah K. Chase, the original owner of the lot, dated the 2nd of August 1844. Daniel·B. Banks insisted that he was entitled to it under a deed of this lot to him in fee by the same grantor, (Mrs. Chase,) dated the 14th of September 1847, for the consideration of $2000, expressed upon the face of the deed. All the facts of the case · relating to these deeds are fully stated in the opinion of this court.

· In the course of the trial the plaintiffs offered *four* prayers,

which were granted by the court below, and are fully stated in the opinion of this court. The evidence, as disclosed by the record, upon which their *second* and *fourth* prayers were based, was, that the consideration for the lot recited in the deed to Banks was grossly inadequate in comparison with its true worth, which was $10,000; that this deed was executed by the grantor mainly to accommodate her grandson, William C. Barney, and under undue influence exercised by him over her, she being at the time upwards of eighty years of age, and remarkable for her overweening partiality to and doting affection for her said grandson, who had, through his undue influence, deprived her of all her property and means to an amount of upwards of $40,000; that Banks had filed, as claims against her under the deed of trust to Talbott, her paper passed to him by Barney to upwards of $20,000; that before the deed was executed it was agreed between her and Barney, that she should execute a mortgage of the lot to Banks, to secure him for advances then or thereafter to be made by him to Barney, and that the deed, as prepared under the direction of Banks, was presented to her by Barney and executed by her at his request and in his presence, she supposing it to be a mortgage; but the plaintiffs gave no direct evidence that Banks was privy to this arrangement for a mortgage. The evidence relating to the other prayers of the plaintiffs is fully stated in the opinion of this court and of the court below.

The defendants offered *two* prayers, both of which were rejected. The *first* asserts that the deed to the plaintiffs is to be construed as operative only upon the death of Mrs. Chase, and that meanwhile she had in her a resulting fee-simple in all the property embraced in it, and if the jury find the execution and delivery of the deed to Banks, and that he paid the consideration therein mentioned, the plaintiffs cannot recover. The *second* asserts that the plaintiffs cannot recover, even if the jury find that the deed to Banks was intended only as a mortgage to secure the payment of moneys advanced or to be advanced by him, if they find said advances were made to an amount beyond the claim in this case.

The defendants excepted to the granting of the said four prayers of the plaintiffs, and to the rejection of their two prayers, and this was the *only exception* taken in the case. The cause was tried in the county court before LE GRAND, A. J., who, upon making the rulings above indicated, delivered the following opinion:

"This is an action, instituted by the plaintiffs, to recover a sum of money admitted to be in possession of the defendants. The defendants set up no claim to the money, but merely hold on to it until it shall be made to appear, in due course of law, to whom it belongs.

"The facts in the case which it is essential should be noticed by the court are as follows:

"1st. It is admitted that the sum held by the defendants is the sum of money awarded as damages, occasioned by the opening of Done street, to the owner of a certain piece of property lying in the city of Baltimore.

"2nd. It is admitted, that on and prior to the 2nd of August 1844, the lot of ground was the property, in fee, of the late Hannah Kitty Chase.

"3rd. That on the 2nd of August 1844, Mrs. Chase executed a deed of bargain and sale of all her property to the plaintiffs and their heirs, to be held by them in trust:—1st. That the said Mrs. Chase and her assigns should be suffered and permitted during her natural life to have, hold, use, occupy, possess and enjoy all and singular the estate; to take and enjoy the rents and profits, and the same to apply to such uses and purposes as she might think proper. 2nd. From and after the decease of said Mrs. Chase, then in trust for the several and same uses and trusts, and subject to the same limitations and restrictions expressed and declared of and concerning the estate of the said Mrs. Chase, in her last will and testament, bearing date 10th November 1836, and the three codicils thereto, bearing date, the first on the 9th June 1841, the second on the 13th April 1842, the third on the 13th May 1844. This being the state of facts, on the 29th January 1845, Mrs. Chase conveyed her life estate in

the rents, &c., to William Talbott, and in September 1847, conveyed, in fee, to Daniel B. Banks, the lot of ground for which the damages held by the defendants were awarded by the commissioners.

"Talbott disclaims all interest in, or claim to, the sum in dispute, and the real controversy is, therefore, between the plaintiffs and Daniel B. Banks.

"The right of plaintiffs to recover is contested on several grounds :

"1st. That under the statute of the 27th Elizabeth, chap. 4, the deed to plaintiffs being a voluntary deed, is void as against subsequent purchasers for value, whether with or without notice.

"2nd. That if *actual* notice would bind a subsequent purchaser, *constructive* notice will not.

"3rd. That whatever may be the true construction of the statute of Elizabeth, Mrs. Chase had a power of revocation at any time before her death, and, of course, had a *jus disponendi;* that the exercise of this right in favor of Banks was, *ipso facto*, a revocation of the will, *pro tanto*, and conferred on Banks a perfect title, or at least constituted the plaintiffs trustees for his use under the deed.

"These I believe are substantially the views which have been so ably urged by the counsel for the defendants.

"I have most carefully examined our Maryland reports for the purpose of ascertaining whether there has ever been in our State any judicial interpretation of the statute of Elizabeth which would enlighten us in our present inquiry, but have not been able to find any such decision. It appears only to have been noticed in 6 *H. & J.*, 444; 5 *G. & J.*, 456; 7 *G. & J.*, 108; 7 *H. & J.*, 257; and, in those instances, in regard to matters which have no relation whatever to the question now before the court. The court is, therefore, called upon to interpret the statute according to the lights furnished by the decisions in England and in the Supreme Court of the United States, and by the tribunals of the other States of the Union.

"The question is, whether the statute of Elizabeth makes

a voluntary conveyance, without any valuable consideration, fraudulent against a subsequent purchaser for a valuable consideration? or, to use the words of Lord Ellenborough, 'whether, in such case, the law do not presume fraud without admitting such presumption to be contradicted?'

"It cannot *now* be questioned what the interpretation of the statute is in England. The case of *Doe vs. Manning*, 9 *East*, 59, has fixed the law there. But that decision was made in 1807, a period subsequent to our Revolution, and therefore of *itself* not binding on our courts, except in so far as it demonstrates what the law was prior to our separation from the mother country. In the very elaborate opinion pronounced by Lord Ellenborough in that case, are to be found many evidences of a contrariety of opinion at different periods among the judges; his lordship, however, was of opinion, that the authorities greatly *preponderate* in favor of the doctrine, that the presumption of fraud from the mere execution of a voluntary deed is such a presumption of law as cannot be contradicted, although it is manifest from his language that if the question had been before him for the first time, he would have favored another view. It appears, also, from the cases collated by him, that in those of them occurring nearest to the period of the passing of the statute, it was held that such deeds were only *prima facie* evidence of fraud as against subsequent purchasers for value, and that such evidence might be rebutted by evidence of good faith and freedom from all design to defraud; and Lord Mansfield, in the case of *Cadogan vs. Kennett, Cowper*, 434, said, *obiter*, the statute of 27 Elizabeth, ch. 4, does not go to voluntary conveyances merely as being *voluntary*, but to such as are fraudulent; and in the case of *Doe vs. Routledge*, decided in 1777, stated, 'that in the statute there was not a word that impeached voluntary settlements merely as being *voluntary*, but as being fraudulent and covinous.' Lord Ellenborough, in alluding to this case, says, that the 3rd section of the act 'furnishes, most unquestionably, a very strong argument in favor of that construction,' and observes, that had not these

cases been opposed by many others of equal weight and authority, there would have been but little doubt in the minds of the court as to this construction being the right one.'

"Now it is manifest, from this opinion, that his lordship did not consider it was a question which admitted of no doubt as to what the rule was, for the very labor bestowed by him on the question, is justified by the necessity there was for showing on which side the weight of authority preponderated. By deciding the question in King's Bench, from motives of public policy, according to the preponderance of authority, the question then and thereafter was free from doubt, but not until then. If this be so, then the eminent jurists in this country, who have asserted that it was not settled prior to our Revolution, have full warrant for the assertion. My own opinion is, that there was, to say the least of it, sufficient contrariety of opinion on the subject, among the judges of England, prior to our Revolution, to justify the declaration, that the rule had not, up to that time, been definitively fixed and uniformly recognised.

"If this be so, then the duty of this court is plain. It is to give such interpretation to the act as its language justifies, and as is approved by eminent jurists of our own country. Looking to the language of the statute, I am forced by it to concur with Lord Mansfield in the opinion, that the act does not denounce as void such conveyances, because of being *voluntary,* but *because of fraud and covin;* and to my mind, it is impossible to come to any other conclusion, especially when the statute is construed with a special reference to its 3d section. The question has been before the Supreme Court of the United States, before the courts of Massachusetts, New York, Pennsylvania, Virginia and South Carolina, and the opinion pronounced by all these tribunals, has been in conformity with the view which I have indicated. Besides this, we have the opinion of Mr. Justice Story and Chancellor Kent, in affirmance of the doctrine laid down by the courts I have referred to, a weight of authority sufficient to establish any doubtful principle. The learned Chancellor Kent, although like Lord

31      v.6

Ellenborough in 9 *East*, felt himself called upon, in 1 *John. Ch. Rep.*, 261, to acquiesce in a rule which his judgment did not approve, subsequently, as will appear by a note to the last edition of his Commentaries, 4 *Vol.*, 464, *note a,* announced the better rule to be as it had been decided by the Supreme Court of the United States, on this point.    See 5 *Peters*, 279 and 281. 1 *Story's Equity*, sec. 426.    4 *Kent's Com.*, 464, *(note a.)*    14 *Mass.*, 137.    12 *Johns.*, 549.    4 *Cowen*, 603, 604.    1 *Rawle*, 231.    5 *Watts*, 378, 456.    3 *Watts & Seargt.*, 479.    6 *Watts & Seargt.*, 485.    *I Robinson's Va. Rep.*, 539.    4 *McCord*, 308.    *Fonblanques' Equity*, 278, *(note f,)* 279, *(note g.)*

"The just rule, then, as it exists in this country, is as follows: That a voluntary conveyance, without fraud, is not *per se* void, as against a subsequent purchaser for value; that the statute does not denounce such conveyances as *voluntary*, but only such of them as are *fraudulent* and *covinous;* and, therefore, if the subsequent purchaser has knowledge of the existence of such deed, his deed cannot take precedence of the voluntary one, if the latter be *bona fide.*

"If I be right in this, then the next question for consideration is, whether there be any proof in the case to go to the jury, from which they may find notice, *actual* or constructive? It is no part of the duty of the court to weigh the credibility of witnesses; that is the province, exclusively, of the jury. All the court have to do is, to see that there has been evidence offered from which they may legitimately, by a fair course of reasoning, deduce the existence of the fact which is sought to be established.    On the point of actual knowledge, there is evidence to go to the jury to show that Mr. Banks, as a creditor of Mrs. Chase, filed his claims under the deed to Talbott, which deed recited the deed to plaintiffs, and also the testimony that Mr. Banks had the records searched for the purpose of seeing the state of the title of Mrs. Chase.    The court cannot withhold this testimony from the jury, and they may, if they choose, find from it and the other facts in the case, actual notice.    The court does not instruct them so to find, or to believe the witnesses; these are matters entirely within

their judgment. But, be the evidence what it may on this point, I have no difficulty in regard to the principle that constructive notice is sufficient, and that if the jury shall believe that the deed to the plaintiffs was recorded in the record office of Baltimore county, at the time when Banks got his deed, he was bound to take notice of the fact, and this opinion I rest entirely on our registration acts, the scope and purpose of which are to preserve a record of title which shall inform all the world of its condition. If a party be not bound to take notice of the record of the title of the one under whom he claims, then the registering of deeds, for most purposes, would be wholly useless.

"Entertaining these views, it is scarcely necessary I should say anything on the other point, to wit, the power of revocacation which is claimed for Mrs. Chase; but inasmuch as the point has been presented, I will briefly state the views I have in regard to it.

"It is not denied that the deed to the plaintiffs conveys the *legal* estate. This has been conceded in the argument; and this being so, it is clear the plaintiffs are entitled to recover in this action, if the jury find the facts to which I have referred. If Mrs. Chase had the power to revoke her will and to create new uses, then the plaintiffs' are the trustees of Banks, and as such entitled to recover in a court of law. (*Matthews vs. Ward*, 10 *G. & J.*, 443.) If the plaintiffs be, as was contended in one aspect of the case, trustees for Banks, there might be some question if there could be a recovery against Banks in the equitable action for money had and received. I say there might be some doubt on the subject, for I do not wish to be understood as asserting the principle positively, but be this as it may, there is no other action I know of which the holder of the legal title could not maintain against him. But this is not an action against Banks, but against the mayor and city council of Baltimore, and no one can recover against them in a *court of law*, but a legal plaintiff. But I do not hold the opinion that Mrs. Chase reserved to herself a power of revocation. On the contrary,

an examination of the authorities has satisfied me that the estate passed under the deed to the plaintiffs, and that the will and codicils, as they existed at the time of the execution of the deed, are only to be looked to for a declaration of the uses and an ascertainment of the limitations on the estate disposed of. The case of *Parker vs. Sir Edward Clere*, in *Coke's Reports, Part 6, page* 18, in no way comes in conflict with this view, although as Mr. Hargrave very properly remarks, "the distinction between a feoffment to the use of a last will and one to such uses as the feoffor should appoint by last will, seems extremely subtle." That case establishes, that where the feoffment is to such uses as the feoffor shall appoint by will, the use vests in the feoffor till declaration made according to the power; but it also establishes that after declaration the estates limited shall take effect by force of the feoffment, the will being considered simply as a declaration of uses. It also decides that where the feoffor by his will, devises the land itself as owner of it without reference to his authority, the land shall pass by the will; that a feoffment to the use of a man's will, and to the use of him and his heirs, is all one, and it is to this extent the authorities quoted from *Bacon*, go. They do not touch the case where there is a declaration of uses in a paper *already in existence* without a power of revocation or of new appointment being reserved. In *such a case* the estate passes under the deed and not under the declaration, whether that be in the form of a will or not. In the case of *Bath vs. Montague*, 3 *Chancery Cases*, 98, it is expressly decided, that where a deed is made to confirm a will the estate limited thereby doth arise by the deed and the will as such is revoked, and the very point we are now considering is disposed of by Lord Chief Justice Holt, thus: "And I take it that a deed is not revocable because it hath an immediate effect, and can be no otherwise revoked but according to a power reserved in the deed itself, and that is *Hussey's Case, Moore,* 756. A man makes a will, and he makes a feoffment to the uses mentioned in the will, though the will be revoked, as sure it is, yet it is a sufficient declaration to

the use." Now this case quoted by Lord Holt from *Moore* is precisely the one now before the court, except that here there is a deed of bargain and sale, instead of feoffment as in that case, a difference which amounts to nothing, inasmuch as enrollment in our State is equivalent to livery at common law.

" Entertaining these views, it follows, that in the opinion of the court, the right of plaintiff to recover has not been successfully resisted."

The verdict and judgment below, was in favor of the plaintiffs, and the defendants appealed.

The cause was argued before ECCLESTON, MASON and TUCK, J.

*Charles F. Mayer* and *John Nelson* for the appellants.

The fund in controversy arose from the condemnation of the lot for the purposes of a street, made subsequent to the deed to Banks, and if his deed was good, he is entitled to the money, the action being for money had and received.  9 *Gill,* 204, *Leighton vs. Preston.*  1 *H. & G.,* 491, *Owings vs. Owings.* We do not deny that the deed to Williams was effective and operative to convey the property, but we insist :—1st. That this deed was in its nature *revocable,* and was revoked by the subsequent deed to Banks.   2nd. If this be not so, then, being a *voluntary* deed, it is void under the statute of 27*th Elizabeth, ch.* 4, as to Banks, who was a *subsequent purchaser for value.*

1st. Now what is the character of the deed to the Williams ? What was the intent and purposes of the grantor in that deed, and of the grantees who accepted it?   The circumstances show that it was never the intent that it should operate *as a deed,* except in connection with and subservient to *the will.* The property was almost entirely personal property, *choses in action,* which had been disposed of by the will.   It is conveyed in confidence, to permit the grantor, during her life, to *take the profits,* &c., and assign the same, and *after her de-*

*cease,* then in trust for the uses and trusts of the will. The rights in remainder were to come *in esse* only upon *her death,* and after she had *assigned* as much of the property as she chose. There was no present right of possession in the *grantees;* this was postponed until her death. The will was in possession of the *grantor,* not of the grantees; it did not accompany the deed. If the purpose was to ascertain the uses and put the property beyond the reach of the grantor, is it not strange that the will did not accompany the deed, or go into possession of the grantees? But so far from this being the case, the will was in her possession, and she used it from time to time, and executed, after the date of the deed, two codicils *revoking* substantial *bequests* in the will. Does not this show that the design was that the deed should be *ambulatory,* and in the power of the grantor? The deed to Talbott is an assertion of her absolute power over the property, for it does any thing but *confirm* the preceding deed; it conveys *all* her estate of every kind, and does not profess to convey a *life estate* merely; and if the deed to the Williams was an irrevocable declaration of uses, the grantor had stripped herself of her *entire* means of support. Now we say that a deed which is to take effect upon the *death* of the grantor, and then in subservience to his *will,* is necessarily testamentary and *revocable,* and this position is sustained by the authorities.

In *Sir Edward Clere's case,* 6 *Coke's Rep.,* 19, it was decided that a feoffment to the uses of the will of the feoffor, and to him and his heirs, is all one. There is a reserved power in the feoffor, and it is nothing more than a feoffment to the feoffor *himself.* This is the law, unless there is something in the feoffment clearly showing that there was a reference to the will as a *declaration of uses and trusts.* In *Dyer's Rep.,* 49, *(b,)* there was a feoffment to the uses of a will, and the will was *annexed* to the feoffment, and livery of seizin made, and yet it was held that this will was *revocable.* That case is stronger than the present, for here the will was not connected with the deed, but was in possession of the grantor. In

*Dyer* 314, *(b,)* there was a common recovery to the intent to perform the will of the party, and it was held that the will was *revocable*, "for *will* and *last will* are understood to be all one." So also in the *Earl of Ormond's case*, in *Hobart's Rep.*, 348. It is true that *Lord Holt*, in the case of *Bath vs. Montague*, says that the *Earl of Ormond's case* is *not law*, which is a very summary mode of *dogmatising* the case out of existence; but it is manifest that *Lord Holt* was either incorrectly reported, or that he was mistaken in reference to the facts, for he speaks of *Hutton* and other judges as concurring with *Montague*, who dissented and held the will irrevocable, whereas the fact was, that *Hutton* did not sit in the case, and *Baron Powell* in *Bath vs. Montague*, says that case was decided by the opinion of *two* judges *against* one. Where a deed gives a power to be exercised by will, an express power of revocation need not be inserted, but it may be revoked, and the original power be executed *toties quoties*, for a will is always *revocable*. 1 *Sugden on Powers*, 484. 2 *Do.*, 14, 15, and cases there cited, which clearly sustain the *Earl of Ormond's case*. Upon these authorities, we maintain that the deed to the Williams was a *testamentary* paper; that it did not impart the character of a deed to the will, but of a will to the deed. It matters not that it was, *in form*, a deed, for an instrument in any form which is not to take effect until after the death of the party, is a will. 3 *Price*, 368, 379, *Attorney General vs. Jones.* 2 *Ves.*, *Jr.*, 231, *Habergham vs. Vincent.* 10 *Do.*, 370, *Reid vs. Shergold.* 4 *Dessa.*, 617, *Milledge vs. Lamar.*

The only case relied upon as overruling these decisions, is that of *Bath vs. Montague*, 3 *Ch. Cases*, 55. This case comes to us in reports of "*no authority*," *(Ram on Legal Judgments, in* 9 *Law Lib.*, 61,) but still we insist that it is not in conflict with the proposition we contend for. In that case the deed *itself* settles the estate upon the grantees *in it.* It does not convey to the *use of the will*, but itself settles the estate by its *own terms*, and not by reference to the will, and would have been just as effectual *without the will* as with it. This is the great point distinguishing that case from the present.

The judges say that so far from the deed in that case confirming or leaning upon the will of 1775, that it *revoked* that will. There the deed itself reserved a right of revocation in a certain mode, which clearly shows that it was the design of *the parties* that it should operate as *a deed,* otherwise there was no necessity of reserving a power of revocation.

2nd. But assuming the deed to Banks to be good and for value, does it not avoid the prior voluntary deed to the Williams? This depends upon the statute of 27 *Elizabeth, ch.* 4, which is set out in *Roberts on Fraudulent Conveyances, page* 7. It provides for the case of a party making a conveyance with an *intent* to defraud. This statute is interpreted in reference to the intent of the *grantor,* and not of the *grantee,* and this intent is manifested by the subsequent sale. The very fact of a sale after a voluntary conveyance, is conclusive evidence of the fraudulent intent, and this is ascertained by the statute, which *prescribes the rule.* All that you have to do to determine this intent, is to prove a subsequent sale. If, then, a party has *notice* of such conveyance, he has *notice* that it is *a fraud,* and the notice therefore cannot affect him. 5 *Coke's Rep.,* 60, *Gooch's case.* 2 *Cowp.,* 280, *Chapman vs. Emery. Ibid.,* 711, *Doe vs. Routledge.* That the subsequent sale is an *absolute* presumption of a fraudulent intent, is the doctrine of all the English cases. 4 *Bos. & Pul.,* 332, *Doe vs. Martyr.* 2 *Taunt.,* 82, *Hill vs. Bishop of Exeter.* 9 *East,* 59, *Doe vs. Manning.* The whole doctrine is carefully examined by Chancellor Kent, in 1 *Johns. Ch. Rep.,* 261, *Sterry vs. Arden.* None of the cases in this country have departed farther from the English doctrine than to say that the subsequent sale is *prima facie* evidence of fraud, and this was the decision in *Cathcart vs. Robinson,* 5 *Pet.,* 279. The interpretation of this statute, up to the time of its adoption by us, is part of the law, and under the Constitution and Bill of Rights of this State, securing to the people of Maryland the benefit of the common law and the English statutes, as they existed on the 4th of July 1776, and found applicable here, this court has no right to alter it. But the very point was decided by *J. Archer,*

in the case of *Bohn vs. Headley*, 7 *H. & J.*, 262, and, as we understand that case, affirmed by the Court of Appeals at page 271, where they say that the deed there was not a conveyance of lands, "and *therefore* not a case embraced by the provisions of the statute of *27th Elizabeth*."

3rd. The *second* and fourth *prayers* of the plaintiffs, granted by the court below, are defective, because they have no foundation in testimony to warrant them. There is no evidence whatever of any privity of Banks to any fraud practiced by Wm. C. Barney upon Mrs. Chase, to obtain for him the absolute deed, under pretext of its being but a mortgage. Nor is there any evidence of a combination between Banks and Barney to set aside the deed to the Williams. The *fourth* prayer is also defective, because it asserts that inadequacy of price is a ground upon which the deed to Banks may be assailed. Inadequacy of price cannot be availed of at law; it can only be availed in another *form*. Mrs. Chase had the *jus disponendi* of the property, and she could affix to it what value she chose. 1 *Story's Eq.*, sec. 244.

*Henry May* and *Robert J. Brent* for the appellees.

The question in the case is, which of the two deeds, that to the Williams or that to Banks, shall stand? It is said that the deed to the Williams is not a deed, but a will, and this is the first question to be considered.

1st. There is no declaration on the part of Mrs. Chase that she intended it to be a will. If she intended it as a will, why did she execute it as a deed and deny herself the *jus disponendi* over her estate? She ratified it as a deed by the subsequent deed to Talbott, which recites the deed to the Williams; here was no mind to revoke that deed and no intent to treat it as a will. It makes a present *disposition* of the property by saying that she shall have a life estate in it. Upon every legal principle, therefore, this is a *deed*, and must be regarded as such in a court of law; it is absolute so far as the legal title is concerned. She had the right to dispose of her property as she chose, and by this deed she refers to the will

particularly by date and to the codicils by date, and makes the dispositions of the will the trusts of the deed. The trusts need not be constituted, but only proved by writing, by any writing, whether prior or subsequent to the deed, and whether stated in the deed or not. 7 *G. & J.*, 163, *Maccubbin vs. Cromwell.* In such cases the trusts referred to, though expressed in a will, are to be considered as if incorporated in the deed, and are not revocable though contained in a will. The deed incorporates the trusts, as part thereof, by reference to the will, as to any other writing for evidence of the trusts.

The great and the leading case on this point is that of *Bath vs. Montague,* and whether it be considered in reference to the weight of judicial reasoning and learning in support of the decision there pronounced, or the terseness and clearness with which it is reported, or the illustrious names of the judges who decided it, it is in all these respects a *model.* In that case a deed was executed in 1681, with intent to dispose of an estate as it was disposed of by a will executed in 1675, and reciting the will, and the question was, whether this deed was revocable, and was revoked by a subsequent will made in 1687, but not executed in accordance with the power of revocation contained in the deed? And it was the unanimous opinion of the judges that the subsequent will could not operate as a revocation. *Lord Holt* says, that to consider a deed revocable because it refers to a will, and is made to confirm it, is a notion that he never heard started before, and is a contradiction to the nature and essence of a deed, which takes effect immediately upon sealing and delivery; that though the will be no part of the deed, yet when the deed doth refer to the will, and the will hath limited the estate, it is as much as if all the limitations had been contained in the deed. And in this opinion all the other judges concur. The only difference between that case and this is, that the trusts of the will in that case were set out in the deed, whereas here the deed only refers to the trusts of the will, but this makes no difference, for, according to the case of *Maccubbin vs. Cromwell,* where a deed refers to a will, it revokes it, and the latter

becomes a mere *declaration of trusts;* its revocable nature is gone, and the estate arises by the deed and not the will. The cases in *Dyer* and *Hobart* were all referred to in that case, and the latter clearly overruled. Upon the authority of this case, then, we insist, that the deed to the Williams is a good *deed,* and that containing no power of revocation it disposed of Mrs. Chase's entire property. *Hussey's case,* in *Moore,* 756, is to the same effect. *Sir Edward Clere's case,* in 6 *Coke's Rep.,* 68, was a feoffment to such uses as the feoffer by his last will *should* declare; that is, by a *future will,* but that is not this case. There is no feoffment here to the uses of a will *hereafter* to be made, but to uses *in presenti*— the trusts of a will already *in existence.*

2nd. This deed was a voluntary deed, and the next question is, whether it is void as to a *subsequent purchaser* with *actual* notice under the statute of 27*th Elizabeth, ch.* 4? This is a *new* question in this State and the authorities elsewhere are conflicting. The earlier English decisions prior to our Revolution had not fixed the construction of this statute, but the later ones have fully decided that the subsequent sale is *conclusive* evidence of fraud, but these we are not bound to follow. *Roberts,* in his work on *fraudulent conveyances,* attempts to vindicate the English doctrine on this subject, but his attempt shows the great difficulty in which that doctrine is involved, and the most learned of the English judges have regretted this strained construction of the statute. 2 *Cowp.* 434. *Ibid.,* 713. Chancellor Kent, in 4 *Kent's Com.,* 510, 512, calls the English doctrine a "*severe construction*" of the statute.

The proof is clear that Banks had *actual* notice of this deed; that he bought the property at a grossly inadequate price for the very purpose of *contesting* it, and can he, under all these circumstances, successfully impeach it as a *fraud* on his rights? Even *Roberts* says, that inadequacy of price and notice of the first conveyance, are sufficient to disable the purchaser from assailing it. 4 *Cruise's Digest,* 528, *sec.* 43. The statutes of 13*th* and 27*th Elizabeth* were passed in *affirmance* of the com-

mon law, by which *notice* is material. 2 *H. & G.*, 430. 4 *Kent*, 464, *note.* 1 *Robinson*, 540. In this country deeds are recorded and notice thus given to all the world, whereas no such practice prevails in England. The decision in *Doe vs. Manning,* was made in 1807, and does not preclude the courts in this country from enquiring into the law as it stood prior to our Revolution. The Supreme Court have expressly decided that *notice* will defeat the claim of the purchaser to impeach the prior voluntary conveyance. 5 *Pet.*, 279, *Cathcart vs. Robinson.* The same court had previously decided that subsequent creditors could not avoid a previous voluntary conveyance duly recorded, merely on the ground that it was voluntary under the statute of 13*th Elizabeth,* (8 *Wheat.*, 229, *Sexton vs. Wheaton,*) and by analogy the same law, under the same circumstances of notice, should apply to voluntary conveyances under the statute of 27*th Elizabeth.* The doctrine of *Lord Mansfield,* in 2 *Cowp.*, 434, 713, and the importance of *notice* are fully established in New York. 12 *Johns.*, 555, *Verplank vs. Sterry.* 4 *Kent,* 463. In Massachusetts: 14 *Mass.*, 139, *Ricker vs. Ham.* In Pennsylvania:—1 *Rawle,* 244, *Lancaster vs. Dolan.* 5 *Watts,* 380, *Foster vs. Walton.* 3 *Watts & Seargt.*, 479, *Thompson vs. Lee.* 6 *Do.*, 485, *Speise vs. McCoy.* In Virginia:—1 *Robinson,* 539, *Bank of Alexandria vs. Patton.* In South Carolina:—4 *McCord,* 308, *Hudnal vs. Wilder.* See also on this subject *Fonb. Eq.*, 278, *note f,* 279, *note g.* 1 *Story's Eq.*, secs. 401, 426, 427. 6 *Geo. Rep.*, 108, *Fleming vs. Townsend.* 1 *Md. Rep.*, 413, *Price & Bevans, vs. McDonald.* 5 *Do.*, 81, *Scott vs. Reardon & wife.* These cases are relied on to show that *registration* is constructive notice to subsequent purchasers, and is sufficient to bind them, but this point need not be decided, for none of the prayers raise this question; they all go upon the idea of *actual* notice.

3rd. Our first prayer is based exclusively upon the ground of *actual* notice. The *third* prayer is also based on the ground of notice, for taking the deeds from Mrs. Barney and Mrs. Oldfield as *indemnity,* proves necessarily that Banks received

his deed with full notice of the deed to the Williams, and because he had notice he required indemnity. The *fourth* prayer also seeks to annul the deed to him by reason of notice, and it might well have been granted without the proviso at the end, but that proviso is nowise objectionable, as it requires the jury to find something more to avoid the deed than was necessary by law; it was therefore nothing of which the appellants can complain. Our *second* prayer stands on a distinct ground, and raises the question of fraud and imposition in the obtention of the deed from Mrs. Chase to Banks, and his privity in said fraud. The evidence fully warrants the prayer. He caused the deed to be prepared and left in the hands of Barney, who presented it to Mrs. Chase and procured her execution of it by false representations of its nature and contents. If then Banks procured this deed by the false statement of his agent, he is to be taken as *particeps criminis* in judgment of law. But this privity may also be inferred from the circumstances in evidence:—1st, he purchased the property worth $10,000 for the nominal consideration of $2000; 2nd, he had full knowledge of the prior deed to the Williams; 3rd, he required two mortgages from third parties as indemnity in case his deed shall be void; 4th, the true purposes of these mortgages are not stated on their face, but purport to be independent transactions; 5th, he did not pay the full nominal consideration of $2000 stated in the deed of Mrs. Chase; 6th, he had bought up over $20,000 of this old lady's paper which he received from this same Barney, who had procured it by undue influence; 7th, the whole case shows a confederacy between Barney and Banks to deprive this old lady of her property under the guise of legal forms, and for a grossly inadequate consideration, and even that consideration paid over to one of the confederates.

ECCLESTON, J., delivered the opinion of this court.

This is an action for money had and received, instituted by the appellees to recover from the Mayor and City Council of Baltimore the amount of damages assessed in favor of the

owner of a lot of ground lying in that city, which damages resulted from the opening of a street. The defendants admit the money to be in their hands, but decline paying it over until it is ascertained who has the right to receive it. The real controversy is between the plaintiffs and Daniel B. Banks.

This lot was formerly owned by Hannah K. Chase, now deceased. On the 2nd of August 1844, whilst she was thus owner of this lot, she executed a deed of all her property to the plaintiffs, and their heirs, executors and administrators, to be held by them in trust, to suffer and permit the said Hannah Kitty Chase and her assigns, for and during the period of her natural life, to have, hold, use, occupy, possess and enjoy all and singular the estate, chattels, effects and property, and the rents, issues, income and profits thereof, during that period, to receive and take, and the same to apply to such uses and purposes as she might think proper. "And from and immediately after the decease of the said Hannah Kitty Chase, then in trust for the several and same uses and trusts, and under and subject to the like powers, limitations, restrictions and conditions as are mentioned, expressed and declared of and concerning the estate and property generally, mentioned in and devised by the last will and testament of the said Hannah Kitty Chase to the trustees therein named; and in and by the three several codicils by her made to said will." Then giving the date of the will and the dates of the three codicils.

On the 28th of January 1845, Mrs. Chase executed a deed to Wm. A. Talbott, conveying to him and his heirs, executors and administrators, all her estate and property of every kind; to have and to hold the same to the use of the said Wm. A. Talbott, his heirs, &c., in trust during the life of Mrs. Chase, to collect and receive the rents, dividends, issues and profits, and to apply the same, first to the payment of her debts, then to her own use, and as she might direct in writing. And after her death, then in trust as to the whole of said estate conveyed, "for the uses, ends, intents and purposes set out and declared" in her last will and testament, and the

several codicils thereto executed by her, and referred to in the deed of trust from her to the plaintiffs.

By a deed dated the 14th of September 1847, Mrs. Chase conveyed to Daniel B. Banks, in fee, the lot of ground upon which the damages in controversy were assessed; which assessment was complete on the 29th of October 1847, and the amount thereof, being $818.66, was on that day in the hands of the defendants. Mrs. Chase died on the 2d of March 1848.

Talbott makes no claim to the sum in dispute; but Banks, through the defendants, resists the right of the plaintiffs to recover, and claims the money under his deed.

Before we look to the bill of exceptions, we deem it proper to examine the two principal grounds on which the claim of the plaintiffs has been resisted.

The first is, that notwithstanding the deed to the plaintiffs, there still remained in Mrs. Chase a power of revocation which enabled her, at any subsequent time during her life, either by will or by deed, to dispose of all or any portion of the property embraced by the deed of 1844, and the previous will and codicils, and that consequently the deed to Banks was a revocation *pro tanto*.

The second is, that if no such power of revocation existed, yet the plaintiffs' deed, being merely voluntary, was void as against Banks, whether he had notice or not, he being a subsequent purchaser for value.

In support of the views entertained by the counsel for the appellants, in regard to the first point, reference is made to *Sir Edward Clere's case*, 6 *Coke's Rep.*, 19; the *Earl of Ormond's case, Hobart's Rep.*, 348; 1 *Dyer's Rep.*, 49, *b;* and 3 *Dyer's Rep.*, 314, *a.*

The principles settled in the first of these cases are, that if a man seized of land in fee, makes a feoffment to the use of such persons and for such estates as he may appoint by his will, by operation of law the use vests in the feoffor, and he has a qualified fee until the use is declared according to the power. A feoffment made to the use of the feoffor's last will, gives him the use in the mean time. And if in such a

case, by his will, he limits estates according to the power, the estates will take effect by force of the feoffment, and the use is directed by the will, so that the will is but declaratory. But if the feoffor devises the land as owner thereof, without reference to his authority, it will pass by the will, because he had in him a devisable estate, as well as power to limit the uses, and therefore might do either, at his pleasure.

It is not necessary to examine, with any minuteness, the principles involved in the *Earl of Ormond's case*, because the decision in that case, if indeed it can be called a decision, can have but little if any influence in favor of the appellants. It appears that the case was referred by the King to the two chief justices, Montague and Hobart, and Justice Doddrige. Montague did not think the instrument under consideration was revocable, the other two judges held that it was. This case being referred to in *Bath vs. Montague*, Lord Holt said: "I do not take that opinion of the two judges, Hobart and Doddrige, there delivered, to be law; and there were other two judges, Montague and Hutton, that were of another opinion, and others were of their mind, and it did not come to a judicial resolution." This remark of Lord Holt, especially in reference to the number of judges who differed from Hobart and Doddrige, has been found fault with by the counsel for the present appellants. It is said to be an error in Lord Holt, or else the reporter has not given his language correctly. In support of this idea, reference has been made to the opinion of Baron Powel, in *Bath vs. Montague*, where he speaks of the opinion of two judges against one. But in this he does not refer so much to the decision of the case as he does to the reasons assigned by the two judges on one side, and by Montague on the other. Be this, however, as it may, it is manifest from the concluding paragraph of the report, as given by Hobart himself, Lord Holt's statement was correct, that Hutton and other judges concerned with Montague in opposition to the views of Hobart and Doddrige. The parties having bound themselves to abide by the King's award, the case was referred to Hobart, Montague and Doddrige. When

it was ascertained that they differed in opinion, the King con-sulted Hutton and other judges, who agreed with Montague. And Mr. Sugden, as well as Lord Holt, states that the point in question was not decided. 1 *Sugden on Pow.*, 273. Mr. Atherly, in his work on *Marriage Settlements*, at *page* 183, in 27 *Law Lib.*, speaks of this case in the following manner: "In Lord Ormond's case, indeed, it is said to have been held, that a voluntary settlement might be revoked without any ex-press power for the purpose; but this case is clearly over-ruled." See 1 *Vern.*, 101, *Villers vs. Beaumont*, and the cases referred to in the notes to that case.

The first case in *Dyer* is thus briefly stated: "In the eigh-teenth year of the now king, a man made a feoffment to per-form his last will, and his will was annexed to the charter of feoffment, and livery of seizin thereupon made accordingly, and it was adjudged that he may alter and revoke this will, although it took effect upon the livery," &c.

This decision is not consistent with the principle adopted in *Hussey's case*, *Moore's Rep.*, 789, and referred to in *Bath vs. Montague*, at *page* 99. There a will was made devising a manor, and subsequently the party made a feoffment of the manor for such persons and for such estates as he had declared by his will, referring to the will by its date. It was held that the will was revoked, but yet it was a sufficient declaration of the uses. This we understand as deciding that the feoffment operated as a revocation of the ambulatory or revocable char-acter of the will, but the reference to it by the feoffment made it a good declaration of uses. Consequently the dispositions of the estate in the will became operative by virtue of the feoffment, and were dependent upon that for their efficacy. The revocation spoken of in the report, did not mean such a revocation of the will as rendered it a perfect nullity in every respect, for it appears the feoffor was a bastard, and although the feoffment was decided to be a revocation of the will, yet it remained good as a declaration of uses, so that there was no escheat to the crown. Thus it seems that by connecting a will already in existence with a feoffment, by a reference to

33    v.6

the will in the manner stated, it does not impart its changeable character to the feoffment, but, by the connection, becomes as stable as the feoffment itself.

According to the report of the second case in *Dyer*, "a man by his deed indented and sealed," after reciting that he had suffered a common recovery against himself of certain lands, upon trust and confidence, "to the intent of performing *his will* touching the disposition of the said lands," declared that, "first, he willed that his said feoffees and their heirs should suffer him to have and receive" the annual profits during his life, and then declared other uses to take effect after his decease. The question being whether, during his life, he might alter and change the uses limited in the indenture, the report states: "And it seems to me that he may well alter this will, for *will* and *last will* are understood to be all one; and this recovery was to the intent to perform the will, and this indenture is as a will, which is alterable; therefore it is not a limitation of uses upon livery made, according to the nineteenth year of H. 8, [11 a, pl. 5.] And other justices agreed to this opinion." If therefore it was not a deed but a will, there could be no doubt of its revocable character. Mr. Sugden thinks the point was taken for granted, that the instrument, notwithstanding its form, was but a will; as Dyer and other judges held the party might "alter his will, for the deed was *quasi* a will, which is changeable." 1 *Sugden on Pow.*, 274, in 15 *Law Lib.*, 147. In adverting to this case, Lord Ch. Justice Treby, in *Bath vs. Montague*, said the instrument was a will, for though in form an indenture, yet when it says "he wills so and so, after he had recited a power to declare by will, this must be taken for a will." But if it is to be considered a deed, then the decision is in direct conflict with *Broad's case*, in *Lea.*, 39, referred to by Lord Holt in *Bath vs. Montague*, at *page* 100. There a man levied a fine to the use of such persons and for such estates as he should appoint by his last will. After this he covenants to stand seized of the lands to the use of his second son and his heirs, and then made a will disposing of

the estate according to the power. In a controversy whether the claim under the deed or that under the will should prevail, it was held that the deed, although a covenant to stand seized, should take effect, and that the will, although made according to the power, came too late to execute it. See also *Hatcher vs. Curtis*, 2 *Freeman's Rep.*, 61.

In *Bath vs. Montague*, 3 *Chan. Cases*, 55, a will was made in 1675 by the Duke of Albemarle, giving parts of his estate upon his dying without issue to several persons, but the bulk of his estate he gave to the Earl of Bath. In 1681 the duke executed a lease and release, reciting in the latter the will. But although the recital differs from the will in some degree, it is stated to be the design and intention of the deed to dispose of the estate as it was disposed of in the will. And the reason for disinheriting the heir at law is said to be because he was a regicide. Then the deed disposes of portions of the estate to certain persons, but the main part of it is settled upon the Earl of Bath; the deed reserving to the Duke of Albemarle the power of revocation at any time, upon the tender of a shilling, by writing under hand and seal in the presence of six witnesses, three of whom were to be peers of the realm, and then to limit new uses. In 1687 the duke executed a will making quite a different disposition of his estate. This will was attested by three witnesses only, not one of them being a peer. Of course it was not a writing in accordance with the power of revocation contained in the deed. But it was contended that the deed of 1681 was revocable as a will, irrespective of the express power contained in it, because it related to a will. Very elaborate opinions were given by Lord Keeper Somers, Chief Justices Holt and Treby, and Baron Powell, deciding unanimously that the will could not operate as a revocation. *Lord Ormond's case*, and the two cases in *Dyer*, already mentioned, were cited and commented upon, but were not considered as authorizing the judges to hold that the deed of 1681 was revocable as a will. And notwithstanding these cases, the judges refused to sustain the argument which seems to have been pressed upon them,

that the deed depended upon the first will, was ancillary to it, and leaned upon it, and therefore the second will revoked the first and the deed likewise. To maintain that a deed reciting a will, and saying it is made to confirm the will, is revocable in its nature, in equity, as a will is at law, is spoken of by Lord Holt as a notion that he never heard started before. And he condemns the idea that a deed is revocable because it relates to a will, as being a contradiction to the nature and essence of a deed; for a deed takes effect immediately upon the sealing and delivery, and cannot be altered or revoked by the maker, unless it contains a power of revocation, and then only according to the power. On page 99, after noticing the case in *Dyer*, 49, Lord Holt says: "But if a man make a a deed of feoffment, and says it shall be to the use of such persons and for such estates as in his will, or as he shall give according to the will, there, though the will doth mention the names and limit the estates, the uses do not arise by the will, but by the deed, for though the will be no part of the deed, yet when the deed doth refer to the will, and the will hath limited the estate, it is as much as if all the limitations had been comprised in the deed." On the question as to the revocation of the deed, all the judges united in the conclusion of Lord Holt's opinion; and his reasoning on the subject was also sanctioned and adopted by the Lord Keeper, who said: "But my lord chief justice has so fully and clearly answered that matter, that I shall not need trouble you with saying any more in it. The cases cited about it are in no sort applicable to this case."

But the counsel for the appellants insist, that the case just referred to cannot properly have much, if any, influence in deciding the one under consideration, because, *here*, the deed simply refers to the will and the codicils, but does not recite or contain within it the dispositions of the estate mentioned in the will and codicils, whilst, *there*, although the deed was made to confirm the will, it nevertheless contained within itself the actual limitations of the estate, some of which differed from the will to some extent.

Since the case of *Maccubbin vs. Cromwell*, 7 *G. & J.*, 157, we suppose it will not be seriously contended that where a deed conveys land in trust for such uses and trusts as are contained in a will, or other instrument, properly described or referred to, the uses and trusts do not take effect. And if they do, it must, of course, be by virtue of the deed. And as deeds in their nature are not changeable, where they contain no power of revocation, if the reference is to a will as containing the uses of the trust, the deed takes away or abolishes the changeable nature of the will, unless the provisions of the deed indicate a different intention on the part of the grantor. This view is certainly correct, if Lord Holt is right, as we think he is, in saying that "when the deed doth refer to the will, and the will hath limited the estate, it is as if all the limitations had been comprised in the deed." And this being so, we do not think the distinction between the two cases, which has been urged with much ingenuity, can avail the appellants to render the case of *Bath vs. Montague* of no influence on the present occasion.

That decision has been assailed by the appellant's counsel as void of authority, because the Chancery Cases are said to be very incorrectly reported. It is true that judges, and some of the elementary writers, have so spoken of them, but Chancellor Kent says: "The great case of the *Duke of Norfolk*, and the case of *Bath vs. Montague*, at the conclusion of the Cases in Chancery, are distinguished exceptions to this complaint, and those great cases are fully and very interestingly reported." 1 *Kent's Com.*, 492, *marginal page*, (*7th Ed.*)

We have been referred to 1 *Sugden on Pow.*, 484, in 15 *Law Lib.*, and 2 *Ibid.*, 14, 15, in 16 *Law Lib.*, in support of the principles contended for by the appellants. But we do not perceive any thing in these references which can establish the proposition, that either the deed or the will in this case is revocable. On *page* 484 of the *1st Vol.*, it is stated, that as a general rule a will is in its nature revocable, and when a power is executed by will an express power of revocation is not necessary to be inserted, but it may be revoked, and the

original power re-executed *toties quoties*.   That when a power is executed by deed, a power of revocation and new appointment may be reserved, although the instrument creating the power does not in express terms authorize it.   And such powers may be reserved *toties quoties*.   But it will be seen on page 485, that when under a power an appointment is made by deed, it cannot be revoked, unless an express power is reserved in the deed executing the power.

On *page* 14 *of the 2d Vol.*, the writer speaks of the peculiar operation of a *will* made in execution of a power.   In most respects it possesses the character of a will, whilst it operates as an execution of the power.   Here again is repeated what is said in the first volume in relation to the irrevocable character of a *deed* executing a power where no power of revocation is reserved in the deed.   Then it is said: "But this does not hold good as to a *will*, for although in truth it is not strictly a will, but simply a declaration of use, yet it so far retains the properties of a will as to be ambulatory till the death of the testator, and consequently revocable without any express power reserved for that purpose."   In support of this several authorities are referred to in *note b*, all of which we have examined, and all of them are cases in which wills, or instruments held to be *quasi* wills, had been made in execution of powers previously created.   Neither of the cases was similar to the present, where the deed refers to a will or other instrument already in existence.

After a very careful examination of the authorities, we think that unless, under some peculiar circumstances, when a deed conveys lands in trust for such uses as are declared or set out in a will already made, neither the deed or the will is revocable, if no power of revocation is reserved in the deed.  And when a deed conveys lands in trust for such uses as the grantor may afterwards appoint by will or deed, if the appointment be by will, then the will may be revoked and new uses declared.   But if this power is executed by such an instrument as may properly be considered a deed, and not a testamentary paper, then the appointment cannot be revoked,

provided the deed executing the power reserves no authority to revoke.

In has been said, that instruments in the form of deeds are frequently held to be testamentary papers, and, as such, subject to revocation, and that the instrument now before us should be so considered, because it limits the estate to the use of the grantor for life, and then in trust for the uses in the will and codicils, which can only take effect, beneficially, after the decease of the grantor, as they would by a will. In 1 *Sug. on Pow.*, 275, it is said to have been well settled, that if the instrument executing a power is testamentary in its nature, the mere circumstance of its being in form a deed, sealed and delivered, will not prevent it from operating as a will. The writer then adds: "But it will not be deemed testamentary merely because the limitations, from their nature and the state of the settlement, cannot take effect until the death of the appointor." See 2 *Sim. Rep.*, 95, in 2 *Eng. Cond. Ch. Rep.*, 354, *Hougham vs. Sandys*, and 9 *Gill*, 440. It may be proper to remark, that Mr. Sugden is here treating of the nature of instruments executing powers previously created. In note 1, on the page just referred to, the decision in the *Attorney General vs. Jones*, 3 *Price*, 368, is noticed. There three judges against Wood, Baron, held that a voluntary deed assigning leasehold and personal estate, securing to the grantor a life estate and the property to others after his death, with a power of revocation, which he confirmed by his will, was a testamentary instrument within the stamp act. This note speaks of the opinion of Mr. Baron Wood as being undoubtedly sustained by the profession. In the more recent case of *Tompson vs. Browne*, 3 *Myl. & Keene*, 32, in 8 *Cond. Eng. Ch. Rep.*, 264, the deed was for the purpose of securing to the grantor dividends of stock for his use during his life, and disposing of the stock to others after his death. The deed also contained a power of revocation. This was held not to be a testamentary paper. And Sir C. C. Pepys, (then Master of the Rolls, but subsequently Lord Chancellor Cottenham,) in speaking of the case of the *Attorney General vs. Jones*, says: "If there

be any thing in that decision to support the notion that where a person by deed settles property to his own use during his life, and after his decease for the benefit of other persons, a power of revocation reserved in such a deed alters the character of the instrument and renders it testamentary, and consequently subject to legacy duty. I can only say that, if this were law, a great number of transactions of which the validity has never been doubted, would be liable to be impeached." See what is said in reference to the two last mentioned cases, in 1 *Jarman on Wills*, from *page* 14 to 19, inclusive, *(2 Amer. Ed.)*

The present deed is not one executing a power, nor does it contain a power of revocation, but is to confirm a will previously made. If it must be regarded as a testamentary instrument, and therefore revocable as a will, it is difficult to perceive what motive could have induced its execution. *Without* it, the grantor was in the same situation as she was *with* it, under such a construction.

Holding these views, we do not think the plaintiffs' claim can be successfully resisted upon the ground which we have been considering as the first objection to it.

The second ground of objection to the claim of the plaintiffs, which we are to consider, arises under the statute of 27*th Elizabeth*, ch. 4. Under its provisions it has been settled beyond controversy, in England, that a voluntary deed is void as against a subsequent purchaser for value, whether he purchased with or without notice. This question has been the fruitful source of much controversy, and has produced many conflicting decisions. But the better American doctrine seems not to be in unison with the established construction of the statute at Westminster Hall. 4 *Kent's Com.*, *(7 Ed.,) Margl.*, *pages* 463 and 464, and *note a, page* 464. 1 *Story's Eq., secs.* 426 to 433, and *note* 1 to *sec.* 426. And with a view to avoid the influence of American decisions, the appellants' counsel insist that in this State the English doctrine must prevail, because of the provision in our constitution in reference to the adoption of the common law, and the statutes which were in

force here at the commencement of the American Revolution. This is a correct position, if by the English doctrine which is to prevail here, is meant such as was settled by judicial decisions previous to our separation from the British empire. And this renders it necessary to ascertain whether, at that time, the construction of the statute had been settled according to the views entertained by the appellants. This subject was examined by the distinguished Chief Justice Marshall, in *Cathcart vs. Robinson*, 5 *Peters' Rep.*, 280. He concedes that the received construction of the English statutes, at the time of the Revolution, may very properly be considered, as accompanying the statutes themselves, and forming an integral part of them. But subsequent decisions, although entitled to great respect, are not to be received as absolute authority. It is the opinion of the court, as expressed by the chief justice, that the construction of the statute of 27th *Elizabeth* was not settled in England before, but subsequent to, the year 1776. After speaking of contrariety and ambiguity in the old cases, it is said: "But this court conceives that the modern decisions, establishing the absolute conclusiveness of a subsequent sale, to fix fraud on a family settlement made without valuable consideration—fraud not to be repelled by any circumstances whatever—go beyond the construction which prevailed at the American Revolution, and ought not to be followed."

It is likewise said: "The universally received doctrine of that day unquestionably went as far as this. A subsequent sale without notice, by a person who had made a settlement not on a valuable consideration, was presumptive evidence of fraud, which threw on those claiming under such settlement the burthen of proving that it was made *bona fide*." And this is the principle of construction which the court adopted, as applicable to the case before them.

To hold that, with notice to the purchaser, the settlement is subject to the presumption of fraud, simply in consequence of the subsequent conveyance for value, we think is not required by the language of the statute, and is inconsistent with

34    v.6

correct moral feeling. It permits a subsequent purchaser to be *knowingly* instrumental in disappointing just and honest expectations, based upon a voluntary deed or settlement, unaffected by the slightest taint of fraud at the time of its execution. We therefore do not hesitate to follow the decision of the Supreme Court rather than the modern English decisions. But it has been insisted that the interpretation of the statute has been so far settled by our own courts, that we are not authorized to follow the principle laid down in *Cathcart vs. Robinson.* The case of *Bohn vs. Headley,* 7 *H. & J.,* 257, is the one referred to in support of this view. The deed upon which the controversy in that case arose, was a transfer of personal property alone. In the court below, Judge Archer held that the deed was not embraced by the statute of 27*th Elizabeth,* because it did not convey or profess to convey real estate. It is true, he expresses the opinion that since the determination in the case of *Doe on the demise of Otley, vs. Manning,* 9 *East,* 59, it may be considered as a settled principle, that a subsequent purchaser may treat a prior voluntary conveyance as a nullity, although he *had notice* of the precedent conveyance. But it will be seen that the judge intimates his doubt as to the reasonableness of the principle, and only speaks of it as settled since the decision in *Doe vs. Manning.* That case having occurred long since the Revolution, Judge Archer's opinion does not militate in the least against the correctness of the view taken by the Supreme Court, that the construction of the statute was not settled prior to 1776. It is also evident that the point was not decided by the Court of Appeals. They dispose of it in a very summary manner, by simply saying, in reference to the deed, "It is not a conveyance of lands, tenements or hereditaments, and therefore not a case embraced by the provisions of the statute of 27*th Elizabeth.*" Admitting that Judge Archer's opinion is a recognition of the English construction, yet as the point was certainly not involved in the case, and the Court of Appeals declined making any decision upon it, notwithstanding our high estimate of the judicial character of the judge, we do

not feel either bound or authorized to adopt his views on the present occasion, in opposition to the decision of the Supreme Court upon the very question now before us. And more especially so as the principle of that decision has been approved of and adopted in many of our sister States.

The Supreme Court admit the doctrine that a subsequent sale, *without notice*, by a person who has made a prior voluntary settlement, is presumptive evidence of fraud, which casts upon those claiming under the settlement the burden of proving it to have been made *bona fide*. But the court find fault with the recent English doctrine, which asserts that a subsequent sale *with notice* to the purchaser that the prior voluntary settlement had been made, is also presumptive evidence of fraud. Whether the notice in such cases must be actual, or may be constructive, it is not necessary for us to decide at present, as we understand the prayers to be based upon actual notice.

From what has been said it will readily appear, that we think the plaintiffs' first prayer was properly granted, upon the evidence in the case. It asserts the proposition, that if the jury should find from the evidence, that the property condemned by the city was the property of Mrs. Chase at the date of the deed to the plaintiffs, and that the said deed was *bona fide* executed and recorded prior to the deed to Banks, and that he had *actual notice* of the plaintiffs' deed prior to the execution of his own deed, then Banks cannot be considered a *bona fide* purchaser without notice, so as to defeat the claim of the plaintiffs.

The second prayer of the plaintiffs asks the court to instruct the jury, that if they should find the deed to Banks was understood and intended by Mrs. Chase, when executed, to be only a security for money advanced by him, and that she was deceived and imposed upon in executing the same, with the knowledge, privity or consent of Banks, then the deed is void.

This prayer has been resisted, upon the ground that there is no evidence to support it. We are not now sitting as a court of equity, to decide whether the evidence or circum-

stances relied upon by the appellees can be sufficient to establish the allegation of fraud, and consequently we are not called upon to say whether there is proof enough for that purpose. But the instruction asks a court of law to submit a question of fraud to the jury; and although we might believe the evidence not strong enough to require the jury to find the fraud, yet if there is any evidence legally tending to prove it, such a prayer could not properly be rejected. We think there is such evidence in this case, and therefore cannot reverse the decision on this point.

The plaintiffs' third prayer is, that if, after the deed to them, the deed to Banks was executed by Mrs. Chase, and that Banks took the deeds from Mrs. Barney and Mrs. Oldfield, as indemnity to him against the deed to the plaintiffs, then the defendants cannot rely upon the deed to Banks to defeat the title of the plaintiffs.

In the record it is stated, that "the plaintiffs further proved, that said Banks also received two deeds from Mary Barney and Catharine C. Oldfield, which are as follows:" Then is inserted a mortgage for $600 from Mrs. Oldfield to Banks, dated the 14th of September 1847, and acknowledged the same day in the city of Baltimore. After which follows a mortgage from Mrs. Barney to Banks for $900, dated the 24th of September 1847, and acknowledged on the same day in the State of Ohio. Each mortgage payable in three years from its date, and each stated to be for money lent by Banks. And immediately after the last mortgage the bill of exceptions proceeds thus: "And that said two deeds were executed upon no other consideration than as an indemnity to said Banks against the said deed from said Hannah to plaintiffs, for any loss he might sustain in the advances, which it was proved by defendants were made by him for said deed to him from said Hannah, but not to the full amount of the consideration therein recited. And further proved, that said Banks agreed with said Mary Barney and Catharine C. Oldfield, before and at the date of said deeds, that he would not enforce the said deeds, or either of them, until he had vindicated the

validity of the deed to him from said Hannah, as against the deed to the plaintiffs, in all the courts to which the same could be taken."

In *Atherly on Marriage Settlements*, 198, when treating of the effect of notice upon a purchaser claiming adversely to a voluntary settlement, it is said: "If he has not only notice, *but takes an indemnity against the settlement; there*, it is clear, he will be bound by the settlement, for, by taking the indemnity, he showed that he did not rely upon the statute, but upon his indemnity." And in support of this principle reference is made to *Jennings vs. Selleck*, 1 *Vern.*, 467.

Under this authority, and with the testimony in the case, we see no error in the granting of this third prayer. The proposition it contains is, that if Banks took the mortgages as indemnity against the plaintiffs' deed, then their deed is not void as to him. In this is necessarily involved actual notice to Banks, for the jury could not find that Banks took the mortgages to indemnify him against the prior deed without also finding that he had knowledge of that deed. How could it be said he took the mortgages to indemnify or save himself harmless against a particular instrument if he did not know of its existence? Although the mortgage from Mrs. Barney is dated subsequently to Banks' deed from Mrs. Chase, yet that deed and the mortgage from Mrs. Oldfield were executed and acknowledged on the 14th of September 1847, and were *both* received by the clerk to be recorded the day after, at half-past twelve o'clock, M. In *Peacock vs. Monk*, 1 *Ves.*, *Sen.*, 133, in regard to a will and a deed, Lord Hardwicke said: "Both instruments being done at the same instant, (as it must be taken, being on the same day.") There, it is true, the two instruments were executed *by* the same person. Here they are *to* the same individual, and proof is given tending to show they are in reference to the same subject matter. And the prayer does not, as was supposed by the appellants' counsel, submit the proposition, that if the jury believed the mortgages were taken by Banks, that alone was sufficient to establish the fact of notice to him of the prior deed, so as to

render his deed inoperative; but, that if the jury believed he took the mortgages *as indemnity* against the plaintiffs' deed, then his deed could not be relied upon by the defendants as against the title of the plaintiffs. With the evidence before them on the subject of indemnity, the jury could not well have come to the conclusion that Banks took the mortgages as indemnity, without also believing that he *then* had knowledge of the prior deed. And, in our view of the law, if he had actual knowledge, the voluntary conveyance was thereby relieved from the presumptive or *prima facie* evidence of fraud, arising from a subsequent conveyance for value. We therefore think the prayer may be sustained upon the ground of notice, necessarily involved in the proposition submitted in it; even admitting there should be a doubt as to how far it is right in reference to the effect of the mortgages considered merely in the light of indemnity, irrespective of the question of actual notice.

The fourth prayer of the plaintiffs is: "If the jury believe from the evidence aforesaid, that the deed read in evidence from Hannah K. Chase to Banks was made colorably in form of a sale between the parties, with a view to defeat or over-reach the prior deed to the plaintiffs, of which said Banks at the time had notice, then said deed to said Banks is void as against plaintiffs, provided the jury find that the consideration paid by said Banks for said deed to him, was inadequate to the true value of the property thereby conveyed, under the circumstances, at the time of executing said deed."

This prayer has been assailed on two grounds:—*First*, because there is no evidence of fraud; and *secondly*, because the proviso assumes inadequacy of price as a ground on which the jury might invalidate the deed to Banks.

What we have said in connection with the second prayer on the subject of fraud, is equally applicable to the first portion of this, and will suffice to show we do not consider the first objection a valid one. In regard to the second, we do not understand the prayer as asserting that inadequacy of price, *per se*, is sufficient to invalidate Banks' deed; but it is

relied upon as a circumstance, in addition to the fraudulent contrivance previously alluded to. It is manifest, from the construction of the prayer, that the jury are required not only to find that the deed was made, colorably, in form of a sale, to defeat the deed of the plaintiffs, of which Banks had notice, but also to find that the consideration paid by him was inadequate to the true value of the property.

It appears in *Roberts' Fraud. Con.*, 371, that inadequacy of price alone is not sufficient to invalidate the deed. But this writer says: "When it has prevailed as an objection, it has generally been coupled with corroborating circumstances of evidence, (in which light *notice* may be of importance,) indicating contrivance and collusion between the seller and purchaser to overturn the precedent conveyance." On page 273, Mr. Roberts states, "that gross inadequacy, amounting only to a colorable consideration, is singly sufficient to negative the pretensions of a purchaser to the benefit of the statute." In *Hicks vs. Hicks*, 5 G. & J., 86, the value of the property was supposed to be from $2000 to $2500, and the price given being $1600, the court did not consider it such an inadequacy of price as would induce them, in the absence of corroborating proof, to treat the sale as a fraud. They say, however: "It is a circumstance to be weighed in the consideration of the subject, but it is not, unsupported, to overbalance many others that indicate an honest and fair negotiation between the parties."

These authorities clearly establish the principle, that inadequacy of price, in connection with other sustaining proof, may be considered in a question like the present.

The court would have been authorized to instruct the jury that the deed was void, if they believed the matters set out in the prayer, exclusive of the proviso, if such an instruction had been asked for. Adding in the proviso a circumstance quite legitimate for the consideration of the jury, in connection with the matters previously submitted to them, surely cannot vitiate the prayer. By it the plaintiffs cast upon themselves an unnecessary burden, for it required them to establish, to

the satisfaction of the jury, not only the fraudulent contrivance, with notice to Banks of the prior deed, but the inadequacy of price also, before 'Banks' deed could be considered void; whereas its void character might have been found without adverting to the inadequacy of price, if that had been omitted in the prayer.

It is hardly necessary to say, this latter portion of the prayer is not vicious for want of evidence to sustain it.

In reference to the two prayers of the defendants, we think it sufficient to say we concur with the court below in the propriety of their rejection. They are inconsistent with the principles which we have already expressed as being applicable to this case.

*Judgment affirmed.*

NOTE BY THE REPORTER.—Since the above case was argued and decided, the unreported manuscript case of *Warren and others' lessee, vs. Richardson and wife; et. al.*, has been discovered, in which the statute of *27th Elizabeth, ch.* 4, was construed by the former Court of Appeals for the Eastern Shore, in the year 1837, and the construction placed upon it in the present case is there fully sustained. The facts of that case are briefly these:

Isaac Warren, by deed of the 29th of August 1812, recorded on the same day, in consideration of natural love and affection, and of five shillings, current money, conveyed to his four infant sons a tract of land in Worcester county, containing one hundred acres, reserving to himself the full use and enjoyment of the same for the support of himself and his three daughters, until the latter should severally attain the age of sixteen years. In 1815, Warren *sold* the land to Isaac Franklin, for $1500. The purchaser took possession, but died before paying the purchase money, or obtaining a deed therefor, leaving a will by which he devised the land to his two daughters. Franklin's executor afterwards paid the purchase money to Warren, who then, by deed of the 24th of May 1816, conveyed the land to the said daughters, the devisees thereof, who took and retained possession of the same.

In 1831, after the death of Warren, three of his said four sons, and the heirs at law of the other, who had died intestate, brought *ejectment* for the land, claiming the same under the deed from their father to them, of the 29th August 1812. The case was tried in Worcester county court, before *Martin*, *C. J., Spence and Tingle, A. J.* In the course of the trial several exceptions were taken by the plaintiffs, only two of which, the *second* and *third*, need be noticed.

*Second Exception.* The defendants, who were the grantees in the deed of the 24th of May 1816, and their husbands, asked the court to instruct the jury that if they find from the evidence that the defendants and those under whom they claim are purchasers for a *bona fide* and valuable consideration

of the land in dispute from Isaac Warren, and have been in possession thereof from the time of the said purchase to the present, and that the deed from him to his infant children, dated the 29th of August 1812, was passed without any other consideration than natural love and affection, and the nominal sum of five shillings, as therein expressed, " then the same deed is voluntary, and by operation of law fraudulent and void against the defendants and those under whom they claim as subsequent purchasers for a *bona fide* and valuable consideration, and that the jury ought to find for the defendants:" which direction the court gave, and the plaintiffs excepted.

*Third Exception* The plaintiffs then asked the court to instruct the jury, that by the deed of August 1812, there was an interest, estate and right in the land mentioned in said deed, existing in said Isaac Warren after the execution thereof, as against the grantees therein. This direction the court gave. They then further prayed the court to instruct the jury, that by the deed of May 1816, no interest in the said land passed to the grantees therein, except the legal title and interest which said Warren had left in him in said land at the time of the execution thereof, and therefore the said last mentioned deed is not a deed or conveyance within the meaning and intention of the statute of 27*th Elizabeth, ch.* 4, and therefore the jury ought to find a verdict for the plaintiffs. This direction the court refused to give, but were of opinion and instructed the jury as in the plaintiffs' *second* exception; and to this ruling the plaintiffs excepted, and the verdict being in favor of the defendants, appealed.

The cause was argued before the Court of Appeals for the Eastern Shore, at its June term 1835, before *Buchanan, C J., Stephen, Archer and Chambers, J.*

*D. Williams,* for the *appellants,* argued that the instruction granted by the court below goes to the full extent of the decision in *Doe vs. Manning,* 9 *East,* 59, and that that case having been decided since our Revolution, was not a binding authority in this State. That in order to make a voluntary conveyance void against a subsequent purchaser within the statute of 27*th Elizabeth, ch.* 4, it must be *covinous* and *fraudulent,* and not *voluntary* merely. He relied upon the case of *Cathcart vs. Robinson,* 5 *Pet.,* 280, to show that up to the period of the American Revolution, the authorities in England, upon the construction of this statute, went only to the extent that a subsequent sale to a *bona fide* purchaser *without notice,* by a person who had made a voluntary settlement, was *presumptive* evidence of fraud, which threw on those claiming under such settlement the burthen of proving that it was made *bona fide,* and that the decisions subsequent to the Revolution go to establish the *absolute conclusiveness* of a subsequent sale, to fix fraud on a voluntary conveyance made without a valuable consideration, and that the former and not the latter doctrine was that by which the courts of this State should be governed.

*Irving Spence,* for the *appellees,* argued that the deed from Warren to his children was voluntary and void by the statute of 27*th Elizabeth, ch.* 4, which made effectual the last deed to the Franklins. He cited the various English authorities upon the subject, and relied especially upon the case of *Doe vs. Manning,* 9 *East,* 59, as to the construction of the statute, and fully sustaining the principles advanced by *Roberts,* in his work on *Fraudulent Conveyances.*

35      v.6

In reference to the case of *Cathcart vs. Robinson,* he said he was willing the whole doctrine advanced there should be applied to this case; that the party there who avoided a voluntary conveyance to give effect to one for valuable consideration, was *"without notice,"* and so were the appellees here; that if it was said the deed from Warren to his children was *recorded,* so was the deed from Cathcart to Woodside in trust for Mrs. Cathcart in that case.

The court (*Chambers, J.,* dissenting,) *reversed* the judgment of the county court and awarded a *procedendo,* and in their directions to the clerk to enter the judgment, which were sent from Annapolis on the 14th of February 1837, they say : " We *dissent* from the county court in their opinion and directions in the plaintiffs' *second* and *third* bills of exception, and *therefore* reverse their judgment."

There was no evidence in the record that the subsequent purchasers (the Franklins,) had any *actual* notice of the prior voluntary deed to the children of Warren. I therefore understand this case to decide two propositions, viz : 1st. That under the statute of 27*th Elizabeth, ch.* 4, a voluntary deed is not void as against a subsequent purchaser for value, *with notice.* 2nd. That the notice which will bind the subsequent purchaser need not be *actual,* but that *constructive* notice furnished by the *recording* of the voluntary deed under our registry laws is sufficient.

It will also be observed that *Justice Archer,* who in 1826, delivered the opinion of Baltimore county court, in the case of *Bohn vs Headley,* reported in 7 *Har. & Johns.,* 261, concurred with the majority of the court in this case in giving a different construction to the statute of 27*th Elizabeth.*